IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In The Matter of the Search of

(617) 594-3607, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
355397085683267, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
("TARGET TELEPHONE #1);

(781) 267-1069, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
359461087281441, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
CORPORATION ("TARGET TELEPHONE
#2");

(774) 265-2844, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
355836086612148, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
(TARGET TELEPHONE #3);

(617) 406-7132, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
356430109917160, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
(TARGET TELEPHONE #4);

(617) 947-5860, WITH INTERNATIONAL
MOBILE SUBSCRIBER IDENTITY
310260189280360, THAT IS STORED AT
PREMISES CONTROLLED BY T-MOBILE
(TARGET TELEPHONE #5);

(617) 763-1717, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
356085090431561, THAT IS STORED AT
PREMISES CONTROLLED BY AT&T
("TARGET TELEPHONE #6);

(857) 284-6516, WITH INTERNATIONAL

M.J./Court No.  20-mj-2057-MBB
20-mj-2058-MMB, 20-mj-2059-MBB,
20-mj-2060-MMB, 20-mj-2061-MBB
20-mj-2062-MMB, 20-mj-2063-MBB,
20-mj-2064-MMB, 20-mj-2065-MBB,
20-mj-2058-MMB, 20-mj-2059-MBB,
and 20-mj-2066-MMB.

MOBILE SUBSCRIBER IDENTITY
312530003427797 and ELECTRONIC
SERIAL NUMBER 353055105843798, THAT
IS STORED AT PREMISES CONTROLLED
BY SPRINT ("TARGET TELEPHONE #7);

(617) 438-1555, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
353903102141049, THAT IS STORED AT
PREMISES CONTROLLED BY AT&T
CORPORATION ("TARGET TELEPHONE
#8");

(617) 699-3436, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
359236062393746, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
("TARGET TELEPHONE #9); and

(617) 272-6805, WITH INTERNATIONAL
MOBILE EQUIPMENT IDENTITY
357751083239118, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
("TARGET TELEPHONE #10).

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **Shena Latta**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain cellular telephones:

      a.   Target Telephone #1 ("TT1") assigned call number (617) 594-3607, with

      International Mobile Equipment Identity 355397085683267, that is stored

      at premises controlled by Cellco Partnership d/b/a Verizon Wireless

      ("Verizon" or "Verizon Wireless"), a wireless telephone service provider

2

headquartered in New Jersey, and that accepts service of process at

Verizon Wireless, 180 Washington Valley Road, Bedminster, NJ 07921.

According to records of Verizon Wireless, the phone has been subscribed

in the name of the City of Boston since 2013.  I have been informed by

representatives of the Boston Police Department ("BPD") that Target

Telephone #1 was the cellular phone provided by the BPD to Lieutenant

Timothy Torigian during the period relevant to the events detailed herein.

The information to be searched is described in the following paragraphs

and in Attachment A-1.  This affidavit is made in support of an application

for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon

Wireless to disclose to the government copies of the information further

described in Section I of Attachment B-1.

b.   Target Telephone #2 ("TT2") assigned call number (781) 267-1069, with

International Mobile Equipment Identity 359461087281441, that is stored

at premises controlled by Verizon Wireless, a wireless telephone that

accepts service of process at the address noted above.  According to

records subpoenaed from Verizon Wireless, Gerard O'Brien, 37 Mann

Street, Braintree, Massachusetts has been the subscriber for Target

Telephone #2 since 2010.  The information to be searched is described in

the following paragraphs and in Attachment A-2.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §

2703(c)(1)(A) to require Verizon to disclose to the government copies of

the information further described in Section I of Attachment B-2.

3

c.   Target Telephone #3 ("TT3") assigned call number (774) 265-2844, with International Mobile Equipment Identity 355836086612148, that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider that accepts service of process at the address noted above. According to records subpoenaed from Verizon Wireless, Kathleen Twitchell[1] of Erin Lane, Norton, Massachusetts has been the subscriber of Target Telephone #3 since 2012.  The information to be searched is described in the following paragraphs and in Attachment A-3.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B-3.

d.   Target Telephone #4 ("TT4") assigned call number (617) 406-7132, with International Mobile Equipment Identity 356430109917160, that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider that accepts service of process at the address noted above. According to records subpoenaed from Verizon Wireless, Darius Agnew, 18 Boyden Street, Dorchester, Massachusetts has been the subscriber of

---

[1] A search of public record databases available to law enforcement lists a Robert Twitchell, with the same date of birth on file with BPD as Sgt. Robert Twitchell, residing at 1 Erin Lane, Norton, Massachusetts with his spouse, Kathleen.  Town of Norton Assessment records list Robert J. Twitchell and Kathleen Twitchell as the owners of a property at 1 Erin Lane, Norton, Massachusetts.  See http://www.assessedvalues2.com/pdfs/218/K006058N96012068.pdf (last visited November 25, 2019).

Target Telephone #4 since 2006.  The information to be searched is described in the following paragraphs and in Attachment A-4.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B-4.

e.  Target Telephone #5 ("TT5") assigned call number (617) 947-5860, with International Mobile Subscriber Identity 310260189280360, that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington that accepts service of process at 4 Sylvan Way, Parsippany, NJ 07054.  According to records subpoenaed from T-Mobile, James Carnes, 366 Washington Street, Apt. A, Canton, Massachusetts 02021 has been the subscriber of Target Telephone #5 since 2008.  The information to be searched is described in the following paragraphs and in Attachment A-5.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B-5.

f.  Target Telephone #6 ("TT6") assigned call number (617) 763-1717, with International Mobile Equipment Identity 356085090431561, that is stored at premises controlled by AT&T, a wireless telephone service provider headquartered in Dallas, Texas, that accepts service of process at AT&T Corporation, 11760 U.S. Highway 1, North Palm Beach, FL 33408.

According to records subpoenaed from AT&T, Henry Doherty, 44 Stock Street, Dorchester, Massachusetts has been the subscriber of Target Telephone #6 since 1994.  The information to be searched is described in the following paragraphs and in Attachment A-6.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B-6.

g. Target Telephone #7 ("TT7") assigned call number (857) 284-6516, with International Mobile Subscriber Identity 312530003427797 and Electronic Serial Number 353055105843798, that is stored at premises controlled by Sprint Corporation, a wireless telephone service provider headquartered in Overland Park, Kansas that accepts service of process at Sprint Corp., 6480 Sprint Parkway, Overland Park, KS 66251.  According to records subpoenaed from Sprint, Target Telephone #7 is currently subscribed by Sybil White, at 127 Wilmington Ave, Dorchester, Massachusetts.[2]  It has been subscribed by Ms. White at various addresses including Everett, Brockton, and Dorchester from at least 2012 to the present.  The information to be searched is described in the following paragraphs and in Attachment A-7.  This affidavit is made in support of an application for a

[2] Sybil White and Sybil Mason are the same individual.  Mason is her married name.  A search of a database of public records for Sybil Mason with the date of birth provided to BPD by Sybil Mason, returns public record results for Sybil White with the same date of birth at the same address of 127 Wilmington Avenue, Dorchester, Massachusetts.

search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B-7.

h.   Target Telephone #8 ("TT8") assigned call number (617) 438-1555, with International Mobile Equipment Identity 353903102141049, that is stored at premises controlled by AT&T, a wireless telephone service headquartered in Dallas, Texas, that accepts service at the address noted above.  According to records subpoenaed from AT&T, Kendra Conway, 75 Maynard Street, Newton, Massachusetts 02122 has been the subscriber of Target Telephone #8 since 2009.[3]  The information to be searched is described in the following paragraphs and in Attachment A-8.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B-8.

i.   Target Telephone #9 ("TT9") is assigned call number (617) 699-3436, with International Mobile Equipment Identity 359236062393746, that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider that accepts service of process at the address noted above. According to records subpoenaed from Verizon Wireless, Diana Lopez, 145 Atherton Street, Milton, Massachusetts has been the subscriber for

---

[3] AT&T records indicate a "user" of "Sandra Stewart."  Agents nonetheless believe Conway to be the user of the phone for the reasons provided in paragraph 203.

Target Telephone #9 since 1997.  The information to be searched is described in the following paragraphs and in Attachment A-9.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B-9.

j.  Target Telephone #10 ("TT10") assigned call number (617) 272-6805, with International Mobile Equipment Identity 357751083239118, that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider that accepts service of process at the address noted above. According to records subpoenaed from Verizon Wireless, Kennedy Semedo, 51 Cranmore Road, Hyde Park, Massachusetts has been the subscriber or Target Telephone #10 since 2015.  The information to be searched is described in the following paragraphs and in Attachment A-10. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B-10.

Upon receipt of the information described in Section I of Attachment B1-B10, government-authorized persons will review the information to locate items described in Section II of Attachment B1-10 for each Target Telephone.

2.  I am a Special Agent with the Department of Justice, Office of the Inspector General, and have been so employed since September 4, 2018.  Prior to this, I served as a Special

Agent with the Social Security Administration, Office of the Inspector General for three years and as a Special Agent with the United States Secret Service for over ten years. I am currently assigned to the Boston Area Office and investigate matters related to public corruption as well as those involving fraud, waste and abuse within the Department of Justice. I completed the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, GA and the United States Secret Service Special Agent Training Academy in Beltsville, MD.  I have also received on-the-job training and attended training courses sponsored by multiple federal agencies related to these types of investigations. I have been involved in many complex investigations.  I have interviewed defendants, witnesses and victims. I have conducted surveillance, worked with confidential informants, and participated in investigations using court authorized interception of wire and electronic communications.  During my law enforcement career, I have also participated in the preparation and execution of search and arrest warrants.  Based upon my training and experience, I am familiar with methods of communication of individuals conducting illegal activity, which include the use of cellular phone communication and records.  The facts in this affidavit come from my personal observations, my training and experience, information obtained from subpoenas, public records, other agents, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of: (1) 18 U.S.C. §666, embezzlement from an agency receiving federal funding; (2) 18 U.S.C. §1343, wire fraud; and (3) 18 U.S.C. §371, conspiracy, have been committed by BPD Lt. Timothy Torigian (TT1), BPD Sgt. Gerard O'Brien (TT2), BPD Sgt. Robert Twitchell (TT3), BPD PO Darius Agnew (TT4), BPD PO James Carnes (TT5), BPD PO Kendra Conway (TT6),

BPD PO Henry Doherty (TT7), BPD PO Sybil Mason (TT8), BPD PO Diana Lopez (TT9), and

BPD PO Kennedy Semedo (TT10), among others.  There is also probable cause to search TT1 to

TT10 for the information described in Attachment A1 to A10 for evidence, instrumentalities,

contraband, or fruits of these crimes as further described in Attachment B1 to B10.

4.       The following chart summarizes the allegations of the Affidavit as to each Target

Telephone:

| Target Telephone (User) | Specific Examples of False Overtime Claims by the User of the Target Telephone | Paragraphs | Total Individual Fraud |
|---|---|---|---|
| TT1 (Lt. Torigian) | November 23, 2016 | 44-47 | May 2016 to February 2019 – **$43,187 (¶138)** |
| | January 30, 2017 | 48-51 | |
| | March 2, 2017 | 52-55 | |
| | September 7, 2017 | 68-71 | |
| | October 3, 2017 | 72-75 | |
| | November 22, 2017 | 76-79 | |
| | January 11, 2018 | 80-83 | |
| | February 6, 2018 | 84-87 | |
| | March 21, 2018 | 88-91 | |
| | May 29, 2018 | 92-95 | |
| | June 26, 2018 | 96-99 | |
| | October 4, 2018 | 104-107 | |
| | November 15, 2018 | 108-111 | |
| | December 20, 2018 | 112-115 | |
| | February 7, 2019 | 116-119 | |
| TT2 (Sgt. O'Brien) | January 30, 2017 | 48-51 | January 2017 to January 2019 – **$25,965 (¶141)** |
| | May 17, 2017 | 56-59 | |
| | July 27, 2017 | 64-67 | |
| | September 7, 2017 | 68-71 | |
| | October 3, 2017 | 72-75 | |
| | November 22, 2017 | 76-79 | |
| | February 6, 2018 | 84-87 | |
| | March 21, 2018 | 88-91 | |
| | May 29, 2018 | 92-95 | |
| | June 26, 2018 | 96-99 | |
| | August 13, 2018 | 100-103 | |
| | October 4, 2018 | 104-107 | |
| | November 15, 2018 | 108-111 | |
| | February 7, 2019 | 116-119 | |
| TT3 (Sgt. Twitchell) | March 2, 2017 | 52-55 | January 2017 to January 2019 – **$25,678 (¶144)** |
| | May 17, 2017 | 56-59 | |
| | June 19, 2017 | 60-63 | |
| | July 27, 2017 | 64-67 | |
| | September 7, 2017 | 68-71 | |
| | October 3, 2017 | 72-75 | |
| | January 11, 2018 | 80-83 | |

|  | February 6, 2018 | 84-87 |  |
|  | March 21, 2018 | 88-91 |  |
|  | May 29, 2018 | 92-95 |  |
|  | June 26, 2018 | 96-99 |  |
|  | August 13, 2018 | 100-103 |  |
|  | October 4, 2018 | 104-107 |  |
|  | December 20, 2018 | 112-115 |  |
| TT4 (Off. Agnew) | August 13, 2018 | 100-103 | May 2017 to December 2018 – **$9,702 (¶168)** |
|  | October 4, 2018 | 104-107 |  |
|  | November 15, 2018 | 108-111 |  |
|  | December 20, 2018 | 112-115 |  |
| TT5 (Off. Carnes) | January 30, 2017 | 48-51 | July 2016 to February 2019- **$20,185 (¶153)** |
|  | March 2, 2017 | 52-55 |  |
|  | May 17, 2017 | 56-59 |  |
|  | July 27, 2017 | 64-67 |  |
|  | September 7, 2017 | 68-71 |  |
|  | November 22, 2017 | 76-79 |  |
|  | February 6, 2018 | 84-87 |  |
|  | March 21, 2018 | 88-91 |  |
|  | May 29, 2018 | 92-95 |  |
|  | August 13, 2018 | 100-103 |  |
|  | October 4, 2018 | 104-107 |  |
|  | November 15, 2018 | 108-111 |  |
| TT6 (Off. Doherty) | March 2, 2017 | 52-55 | May 2016 to February 2019 – **$26,032 (¶147)** |
|  | July 27, 2017 | 64-67 |  |
|  | September 7, 2017 | 68-71 |  |
|  | October 3, 2017 | 72-75 |  |
|  | February 6, 2018 | 84-87 |  |
|  | March 21, 2018 | 88-91 |  |
|  | May 29, 2018 | 92-95 |  |
|  | June 26, 2018 | 96-99 |  |
|  | August 13, 2018 | 100-103 |  |
|  | November 15, 2018 | 108-111 |  |
|  | December 20, 2018 | 112-115 |  |
|  | February 7, 2019 | 116-119 |  |
| TT7 (Off. Mason) | January 30, 2017 | 48-51 | May 2016 to May 2018 – **$7,208 (¶171)** |
|  | June 19, 2017 | 60-63 |  |
|  | February 6, 2018 | 84-87 |  |
| TT8 (Off. Conway) | January 11, 2018 | 80-83 | December 2017 to February 2019 – **$16,479 (¶162)** |
|  | February 6, 2018 | 84-87 |  |
|  | March 21, 2018 | 88-91 |  |
|  | June 26, 2018 | 96-99 |  |
|  | August 13, 2018 | 100-103 |  |
|  | October 4, 2018 | 104-107 |  |
|  | November 15, 2018 | 108-111 |  |

| | December 20, 2018 | 112-115 | |
| | February 7, 2019 | 116-119 | |
| TT9 (Off. Lopez) | March 2, 2017 | 52-55 | May 2016 to February 2019 – |
| | May 17, 2017 | 56-59 | **$21,219 (¶150)** |
| | June 19, 2017 | 60-63 | |
| | July 27, 2017 | 64-67 | |
| | September 7, 2017 | 68-71 | |
| | October 3, 2017 | 72-75 | |
| | November 22, 2017 | 76-79 | |
| | January 11, 2018 | 80-83 | |
| | March 21, 2018 | 88-91 | |
| | August 13, 2018 | 100-103 | |
| | October 4, 2018 | 104-107 | |
| TT10 (Semedo) | January 30, 2017 | 48-51 | May 2016 to February 2019 – |
| | May 17, 2017 | 56-59 | **$4,594 (¶177)** |

## PROBABLE CAUSE

### The Boston Police Department Evidence Warehouse

5.      The Boston Police lease two buildings located at 1555 Hyde Park Avenue in Hyde Park which serve as a Central Supply Unit (CSU)[4] and as the Boston Police Evidence Warehouse.

6.      Sworn police officers assigned to the warehouse generally work from 7:30 a.m. to 4:00 p.m. Mondays through Fridays.

### The Evidence Control Unit

7.      The BPD Evidence Control Unit ("ECU") is assigned to the evidence warehouse. The Evidence Control Unit manages the inventory of evidence seized by the BPD.

---

[4] Central Supply is exactly what it sounds like, paper, pens, *etc*.  CSU is staffed by civilian employees.   In addition to Central Supply, the Ballistics Unit of BPD also has two sworn police officers assigned to the warehouse, and the location houses the BPD archives, which is staffed by a civilian archivist.

8.      From at least May 2016, up through February of 2019, Lieutenant Timothy Torigian (TT1) commanded the ECU at the warehouse.

9.      From at least December 2016, up and through February 2019, Sergeant Gerard O'Brien (TT2) was assigned to the ECU as a sergeant, overseeing members of the ECU.

10.     From at least January 2017, up and through January 2019, Sergeant Robert Twitchell (TT3) was assigned to the ECU as a sergeant, overseeing members of the ECU.

11.     From at least May of 2017, up and through December of 2018, BPD PO Darius Agnew (TT4) was assigned to the ECU at the evidence warehouse.

12.     From at least July of 2016, up and through February of 2019, BPD PO James Carnes (TT5) was assigned to the ECU at the evidence warehouse.

13.     From at least May of 2016, up and through February 2019, BPD PO Henry Doherty (TT6) was assigned to the ECU at the evidence warehouse.

14.     From at least May of 2016, up and through May of 2018, BPD PO Sybil Mason (TT7) was assigned to the ECU at the evidence warehouse.

15.     From at least December of 2017, up and through February 2019, BPD PO Kendra Conway (TT8) was assigned to the ECU at the evidence warehouse

16.      From at least May of 2016, up and through February 2019, BPD PO Diana Lopez (TT9) was assigned to the ECU at the evidence warehouse

17.     From at least May of 2016, up and through February 2019, BPD PO Kennedy Semedo (TT10) was assigned to the ECU at the evidence warehouse.

18.     Various other BPD officers identified below, including Michael Murphy, Andre Williams, Joseph Nee, and Thomas Nee, were assigned to the ECU in the period between May 2016 and February 2019.

14

19.     The members of the ECU were scheduled to work a regular shift from Mondays to Fridays, 7:30 a.m. to 4:00 p.m.

## Overtime at the ECU Warehouse

**A.     Evidence Control Unit Overtime**

20.     Officers assigned to the ECU are eligible for a number of overtime programs.

21.     Since at least January 2017, one of the overtime programs available to members of the ECU involved the control and organization of the inventory of the warehouse.

22.     As a general matter, this overtime involved disposing of old and unneeded evidence, organizing the evidence at the warehouse more efficiently, and, scanning older evidence into newer computer systems so that it can be tracked more effectively.

23.     This overtime is described most often in the relevant overtime slips as "purge," "inventory," "scan," and "destruction," overtime.  Though the purposes appear distinct, the terms also appear to have been used largely interchangeably in the overtime slips submitted by various officers to describe the work being done at the warehouse during the 4:00 p.m. to 8:00 p.m. overtime shifts.

24.     This overtime was scheduled to occur at the end of the officers' regular shift, from 4:00 p.m. through 8:00 p.m., most often, Monday through Thursday.

25.     I am informed by the BPD Superintendent overseeing the ECU that these overtime hours must be performed at the evidence warehouse.  There is no "offsite" overtime for "scan," "purge," "inventory," or "destruction," overtime and officers cannot perform this work from home.

15

**Overtime Slips**

26.     BPD pays its employees at a rate of one and half times their regular rate of pay for overtime hours.  This meant that for overtime during the period relevant to this warrant, Lt. Torigian earned approximately $80 per hour of overtime, Sgts. Twitchell and O'Brien earned approximately $70 per hour of overtime, and the police officers earned approximately $60 per hour of overtime.

27.     In order to be paid for overtime, BPD employees must complete an "Overtime Slip" which contains entries for, among other things: (1) an employee's name and unique BPD identification number; (2) a three digit code for the type of overtime performed; (3) the date that the overtime was worked; (4) the time that the overtime began and ended; (5) an entry for "Actual Hours Worked;" (6) a signature line for the supervisor certifying that the overtime had been worked; and (7) a signature line for the commander authorizing payment.

28.     As a general matter, the slips have to be signed by an individual holding higher rank.  For the ECU, Lt. Torigian would most often sign the slips of the sergeants and officers. Torigian's slips, in contrast, would be signed by a BPD Superintendent.  On occasion, Twitchell and O'Brien would sign officers' slips along with Torigian.  And, on other occasions, the two Sergeants would each sign the other's overtime slip.

29.     Overtime shifts occurring at the end of an officer's regular work hours, called "extended tours," are "hour for hour" overtime.  That means that an employee is paid only for the hours actually worked.  This "hour for hour" overtime is paid in fifteen minute increments, meaning that, in the case of a four hour shift, an individual needed to work at least three hours and forty six minutes in order to be properly paid for four hours of overtime.

16

30.     The overtime slips themselves make significant note of this.  There is a field, both bolded and underlined, that requires officers to report the "**Actual Hours Worked:**".  No other entry on the overtime slip is similarly underlined and bolded.

31.     The BPD, in the usual and regular course of its business, maintains payroll records for each of its employees.   These records can be retrieved for individual employees going back several years.

32.     In connection with this investigation, agents have obtained BPD payroll records documenting the overtime hours for which members of the ECU have been paid since at least May 2016, including the overtime slips submitted by members of the ECU during that period.

## BPD Warehouse Alarms

33.     The alarm system for the BPD evidence warehouse is maintained by the Boston Municipal Protective Services Department, which provides security for almost all buildings owned and controlled by the City of Boston (*i.e.*, Police Stations, Fire Stations, City Hall, Schools, Libraries, *etc.*)

34.     The BPD Warehouse is extensively alarmed, with alarms on each outer door, separate alarms on various trailers and safes within the building, and, internal motion sensors.

35.     The alarm system at the ECU warehouse is comprised of several "accounts."[5] These include various zones, such as a large safe, trailers containing narcotics, a section assigned exclusively to the ballistics unit, and the "perimeter account," which arms the alarms on each entry/exit along with internal motion sensors for the entire warehouse (*i.e.*, both the areas used

---

[5] "Accounts" appears to be a term of art.  It effectively means zones or specific areas alarmed.

17

by central supply and the ECU). The alarms are continuously monitored, all day, every day of the year.

36.     According to the individual responsible for installing and maintaining the alarm system at the warehouse, it is impossible for anyone to remain within the ECU Warehouse once the perimeter alarm is set.  A person inside the building would either trigger the motion sensors, or, would have to disarm the alarm in order to exit the building.

37.     The alarm system electronically stores detailed records of the exact date and time when each account for the alarm is armed and disarmed.  These records include the dates and times when the "perimeter alarm" for the warehouse has been armed and disarmed.

38.     As relevant to the instant warrant, agents have been provided copies of all of the alarm records for the ECU Warehouse dating back to at least January 2016.

### Comparing Perimeter Alarm Records to the Hours ECU Officers Claimed to Have Worked

39.     A comparison of the alarm records and the overtime hours that the ECU Officers claimed to have worked reveals significant discrepancies between the hours that the officers claimed to have worked, and, the times that the building was closed, locked, and alarmed.

40.     In short, as relevant to the request made by way of the instant warrant, the alarm records show that from at least May 2016, when Lt. Torigian took over the command of the ECU, through February 2019, the members of ECU routinely left overtime shifts an hour, or more, before the end of their overtime shifts.

41.     On occasions where the comparison demonstrates that the members of the ECU left the warehouse an hour, or more, before the end of their overtime shifts, each member of the ECU nonetheless falsely claimed in overtime slips to have worked the full four hour shift.

18

42.     As detailed below, these false claims and false submissions were repeatedly endorsed by Lt. Torigian, Sgt. Twitchell, and Sgt. O'Brien.

43.     Specific examples include the following:

### November 23, 2016

44.     On or about November 23, 2016, Lt. Torigian claimed in an overtime slip to have worked overtime on November 23, 2016 from 4:00 p.m. (1600) to 8:00 p.m. (2000) at the "ECU" Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," Lt. Torigian claimed 4 hours, and claimed to have been performing "purge" overtime.  The overtime code on the slip was "332."[6]

45.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.[7]

46.     In contrast to the claim made in the overtime slip, the perimeter alarm records show that the building was locked up[8] and that the perimeter alarm was set at 3:42 p.m., before the overtime shift even began.

47.     After 3:42 p.m., the building was not opened until Friday, November 25, 2016,[9] at 7:44 a.m.

---

[6] Code "332" applies to "extended tours" described as "administrative : div/unit" work and involves "hour for hour" overtime, which is earned in fifteen minute increments.

[7] The Superintendent responsible for signing Lt. Torigian's overtime slips was assigned to BPD Headquarters located in 1 Schroeder Plaza, Boston, and rarely visited the warehouse.  There is currently no evidence that the Superintendent was involved in the conduct detailed herein.

[8] Agents have been informed that the perimeter alarm will not arm in the usual course unless all of the entry/exits are secured.

[9] The Thanksgiving holiday was celebrated on November 24, 2016.

## January 30, 2017

48.     On or about January 30, 2017, Lt. Torigian, Sgt. O'Brien, and five other BPD officers, James Carnes, Sybil Mason, Michael Murphy, Joseph Nee, and Kennedy Semedo, all claimed in overtime slips to have worked overtime on January 30, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge"[10] overtime.   The overtime code on each slip was "332."

49.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's slip was signed by Lt. Torigian as the supervisor certifying that the hours had been worked, four of the officer's slips were signed by Sgt. O'Brien as the supervisor certifying that the hours had been worked, and one of the officer's slips was signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked.  All six slips were signed by Lt. Torigian as the commander authorizing payment.

50.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:56 p.m., more than an hour before the end of the overtime shift.

51.     After 6:56 p.m., the building was not opened until 7:33 a.m. the following morning.

---

[10] Officer Joseph Nee's slip reported "purge/ auction prep" in that section.

**March 2, 2017**

52.     On or about March 2, 2017, Lt. Torigian, Sgt. Twitchell, and four other BPD officers, James Carnes, Henry Doherty, Diana Lopez, and Ronald Nelson, all claimed in overtime slips to have worked overtime on March 2, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" overtime.  The overtime code on each slip was "332."

53.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's slip was signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  The four officer's slips were signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked and were signed by Lt. Torigian as the commander authorizing payment.

54.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:45 p.m., more than one hour before the end of the overtime shift.

55.     After 6:45 p.m., the building was not opened until 7:34 a.m. the following morning.

**May 17, 2017**

56.     On or about May 17, 2017, Sgt. Twitchell, Sgt. O'Brien, and four other BPD officers, James Carnes, Diana Lopez, Ronald Nelson, and Kennedy Semedo, all claimed in overtime slips to have worked overtime on May 17, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to

21

specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" or "drug destruction" overtime. The overtime code on each slip was "332."

57.     Sgt. Twitchell's and Sgt. O'Brien's slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment. Two of the four officers' slips were signed by Sgt. Twitchell, and, two were signed by Sgt. O'Brien, as the supervisor certifying that the hours had been worked. All four of the officers' slips were signed by Lt. Torigian as the commander authorizing payment.

58.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:34 p.m., more than one hour before the end of the overtime shift.

59.     After 6:34 p.m., the building was not opened until 7:45 a.m. the following morning.

### June 19, 2017

60.     On or about June 19, 2017, Sgt. Twitchell, and five other BPD officers, Diana Lopez, Sybil Mason, Michael Murphy, Joseph Nee, and Ronald Nelson, all claimed in overtime slips to have worked overtime on June 19, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse. On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "drug dest," or "purge drug struction" (sic) overtime. The overtime code on each slip was "332."

61.     Sgt. Twitchell's slip was signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment. The five officer's slips were signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked and by Lt. Torigian as the commander authorizing payment.

22

62.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:12 p.m., almost two hours before the end of the overtime shift.

63.     After 6:12 p.m., the building was not opened until 7:45 a.m. the following morning.

<u>**July 27, 2017**</u>

64.     On or about July 27, 2017, Sgt. Twitchell, Sgt. O'Brien, and five other BPD officers, James Carnes, Henry Doherty, Diana Lopez, Ronald Nelson, and Andre Williams, all claimed in overtime slips to have worked overtime on July 27, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "drug dest," "drug destruct," or "drug destruction" overtime.  The overtime code on each slip was "332."

65.     Sgt. Twitchell's slip was signed by Sgt. O'Brien as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's slip was signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked and as the commander authorizing payment. Three of the five officer's slips were signed by Sgt. O'Brien, and two were signed by Sgt. Twitchell, as the supervisor certifying that the hours had been worked.   Three of the five officer's slips were signed by Sgt. Twitchell, and two were signed by Sgt. O'Brien, as the commander authorizing payment.

66.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 5:25 p.m., more than two and a half hours before the end of the overtime shift.

23

67.     After 5:25 p.m., the building was not opened until 7:37 a.m. the following morning.

## September 7, 2017

68.     On or about September 7, 2017, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien, and four other BPD officers, James Carnes, Henry Doherty, Diana Lopez, and Ronald Nelson, all claimed in overtime slips to have worked overtime on September 7, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" or "currency purge" overtime.  The overtime code on each slip was "332."

69.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's and Sgt. O'Brien's slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Two of the four officer's slips were signed by Sgt. O'Brien, one was signed by Sgt. Twitchell, and one was signed by Lt. Torigian, as the supervisor certifying that the hours had been worked.  All four of the officers' slips were signed by Lt. Torigian as the commander authorizing payment.

70.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:10 p.m., almost two hours before the end of the overtime shift.

71.     After 6:10 p.m., the building was not opened until 7:42 a.m. the following morning.

24

**October 3, 2017**

72.     On or about October 3, 2017, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien, and four other BPD officers, Henry Doherty, Diana Lopez, Ronald Nelson, and Andre Williams, all claimed in overtime slips to have worked overtime on October 3, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" or "purge currency drugs" overtime.  The overtime code on each slip was "332."

73.     Lt. Torigian's slip was signed by a civilian deputy of the BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.[11]  Sgt. Twitchell's and Sgt. O'Brien's slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  The four officers' slips were signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked and by Lt. Torigian as the commander authorizing payment.

74.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:15 p.m., more than one and a half hours before the end of the overtime shift.

75.     After 6:15 p.m., the building was not opened until 7:39 a.m. the following morning.

---

[11] The Superintendent has informed agents that this individual was authorized to sign overtime slips in his absence.

**November 22, 2017**

76.     On or about November 22, 2017, Lt. Torigian, Sgt. O'Brien, and five other BPD officers, James Carnes, Diana Lopez, Michael Murphy, Thomas Nee, and Andre Williams, all claimed in overtime slips to have worked overtime on November 22, 2017 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" overtime.  The overtime code on each slip was "332."

77.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's slip was signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  The five officer's slips were signed by Sgt. O'Brien as the supervisor certifying that the hours had been worked.  Four of the officer's slips were signed by Lt. Torigian, and one was signed by Sgt. Twitchell, as the commander authorizing payment.

78.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 5:10 p.m., almost three hours before the end of the overtime shift.

79.     After 5:10 p.m., the building was not opened until November 24, 2017[12] at 7:47 a.m.

---

[12] The Thanksgiving holiday was celebrated on November 23, 2017.

### January 11, 2018

80.     On or about January 11, 2018, Lt. Torigian, Sgt. Twitchell,[13] and four other BPD officers, Kendra Conway, Diana Lopez, Michael Murphy, and Andre Williams, all claimed in overtime slips to have worked overtime on January 11, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "drug review destruct," or "drug burn prep" overtime.  The overtime code on each slip was "332."

81.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's slip was signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Three of the four officers' slips were signed by Sgt. Twitchell, and one by Lt. Torigian, as the supervisor certifying that the hours had been worked.  All four of the officer's slips were signed by Lt. Torigian as the commander authorizing payment.

82.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:06 p.m., almost two hours before the end of the overtime shift.

83.     After 6:06 p.m., the building was not opened until 7:39 a.m. the following morning.

_____

[13] Sgt. Twitchell's overtime slip is dated January 11, 2017.  This is believed to be a dating error as the slip was retrieved from BPD overtime records for the month of January 2018.

## February 6, 2018

84.     On or about February 6, 2018, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien and six other BPD officers, James Carnes, Kendra Conway, Henry Doherty, Sybil Mason, Ronald Nelson, and Andre Williams, all claimed in overtime slips to have worked overtime on February 6, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "scan," or "scan drugs purge" overtime.  The overtime code on each slip was "332."

85.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's and Sgt. O'Brien's slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Four of the six officers' slips were signed by Sgt. O'Brien, and two of the six by Sgt. Twitchell, as the supervisor certifying that the hours had been worked.   All six of the officers' slips were signed by Lt. Torigian as the commander authorizing payment.

86.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:32 p.m., well over one hour before the end of the overtime shift.

87.     After 6:32 p.m., the building was not opened until 7:20 a.m. the following morning.

## March 21, 2018

88.     On or about March 21, 2018, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien and five other BPD officers, James Carnes, Kendra Conway, Henry Doherty, Diana Lopez,  and Ronald

Nelson, all claimed in overtime slips to have worked overtime on March 21, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "scan," "purge," or "scan/purge/drugs" overtime.  The overtime code on each slip was "332."

89.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's, Sgt. O'Brien's, and the five officer's slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

90.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up and that the perimeter alarm was set at 6:10 p.m., well over one and a half hours before the end of the overtime shift.

91.     After 6:10 p.m., the building was not opened until 7:09 a.m. the following morning.

**May 29, 2018**

92.     On or about May 29, 2018, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien, and three other BPD officers, James Carnes, Andre Williams, and Henry Doherty, all claimed in overtime slips to have worked overtime on May 29, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "drugs" or "scan" overtime.  The overtime code on each slip was "332."

29

93.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's, Sgt. O'Brien's, and all three officers' slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

94.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 5:31 p.m., well over two hours before the end of the overtime shift.

95.     After 5:31 p.m., the building was not opened until 7:34 a.m. the following morning.

## June 26, 2018

96.     On or about June 26, 2018, Lt. Torigian, Sgt. Twitchell, Sgt. O'Brien, and two other BPD officers, Henry Doherty and Kendra Conway, all claimed in overtime slips to have worked overtime on June 26, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge," "scan," or "drugs/scan/purge" overtime. The overtime code on each slip was "332."

97.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's, Sgt. O'Brien's, and both officers' slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

98.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 6:12 p.m., well over one and a half hours before the end of the overtime shift.

99.     After 6:12 p.m., the building was not opened until 7:13 a.m. the following morning.

## August 13, 2018

100.     On or about August 13, 2018, Sgt. Twitchell, Sgt. O'Brien, and five other BPD officers, Darius Agnew, James Carnes, Kendra Conway, Henry Doherty, and Diana Lopez, all claimed in overtime slips to have worked overtime on August 13, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "purge" or "drugs/scan/purge" overtime.  The overtime code on each slip, except for Officer Lopez's, was "332."  Officer Lopez's slip used the overtime code, "320."[14]

101.     Sgt. Twitchell's slip was signed by Sgt. O'Brien as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's slip was signed by Sgt. Twitchell as the supervisor certifying that the hours had been worked and as the commander authorizing payment. Four of the five officers' slips were signed by Sgt. Twitchell as

---

[14] Overtime code "320," is the overtime code for "extended tours" described as "Operation Ceasefire Investigative" work.  (Operation Ceasefire is a program seeking to reduce gang violence, illegal gun possession, and gun violence in communities in Boston). It is presently unclear whether the use of the Operation Ceasefire code is merely a typographical error.  For purposes of this Affidavit, no loss has been attributed to Lopez, or any member of ECU, for any overtime slip utilizing the "320" overtime code.  Those overtime claims may nonetheless be the basis of additional claims of loss in the future.

the supervisor certifying that the hours had been worked and as the commander authorizing

payment and one officer's slip was signed by Lt. Torigian in those capacities.

102.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter

alarm records show that the building was locked up, closed, and the perimeter alarm set at 6:13

p.m., almost two hours before the end of the overtime shift.

103.     After 6:13 p.m., the building was not opened until 7:18 a.m. the following

morning.

<u>**October 4, 2018**</u>

104.     On or about October 4, 2018, Lt. Torigian, Sgt. O'Brien, Sgt. Twitchell, and six

other BPD officers, Darius Agnew, James Carnes, Kendra Conway, Diana Lopez, Michael

Murphy, and Andre Williams, all claimed in overtime slips to have worked overtime on October

4, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of

the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours,

and claimed to have been performing "scan," "purge" or "drugs/purge/scan" overtime.   The

overtime code on each slip, except for Officer Lopez's, was "332."  Officer Lopez's slip used the

overtime code, "320."

105.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor

certifying that the hours had been worked and as the commander authorizing payment.  Sgt.

Twitchell's, Sgt. O'Brien's, and all six officers' slips were signed by Lt. Torigian as the

supervisor certifying that the hours had been worked and as the commander authorizing

payment.

32

106.    In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 5:16 p.m., well over two and a half hours before the end of the overtime shift.

107.    After 5:16 p.m., the building was not opened until 7:37 a.m. the following morning.

### November 15, 2018

108.    On or about November 15, 2018, Lt. Torigian, Sgt. O'Brien, and four other BPD officers, Darius Agnew, James Carnes, Kendra Conway, and Henry Doherty, all claimed in overtime slips to have worked overtime on November 15, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "scan" or "purge" overtime.  The overtime code on each slip was "332."

109.    Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's and all four officers' slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

110.    In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 5:57 p.m., over two hours before the end of the overtime shift.

111.    After 5:57 p.m., the building was not opened until 7:44 a.m. the following morning.

**December 20, 2018**

112.     On or about December 20, 2018, Lt. Torigian, Sgt. Twitchell, and five other BPD officers, Darius Agnew, Kendra Conway, Henry Doherty, Michael Murphy, and Andre Williams, all claimed in overtime slips to have worked overtime on December 20, 2018 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to specify the "actual hours worked," each claimed 4 hours, and each claimed to have been performing "scan," "purge," or "drugs/purge/drug destruct" overtime.  The overtime code on each slip was "332."

113.     Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. Twitchell's and all five officers' slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

114.     In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 5:59 p.m., just over two hours before the end of the overtime shift.

115.     After 5:59 p.m., the building was not opened until 7:05 a.m. the following morning.

**February 7, 2019**

116.     On or about February 7, 2019, Lt. Torigian, Sgt. O'Brien, and four other BPD officers, Kendra Conway, Henry Doherty, Michael Murphy, and Kennedy Semedo, all claimed in overtime slips to have worked overtime on February 7, 2019 from 4:00 p.m. (1600) to 8:00 p.m. (2000) inside the ECU Warehouse.  On the portion of the overtime slip asking the officer to

specify the "actual hours worked," each claimed 4 hours, and claimed to have been performing "scan" or "purge" overtime.   The overtime code on each slip was "332."

117.    Lt. Torigian's slip was signed by a BPD Superintendent as the supervisor certifying that the hours had been worked and as the commander authorizing payment.  Sgt. O'Brien's and all four officers' slips were signed by Lt. Torigian as the supervisor certifying that the hours had been worked and as the commander authorizing payment.

118.    In contrast to the claims made, and endorsed, in the overtime slips, the perimeter alarm records show that the building was locked up, closed, and the perimeter alarm set at 6:15 p.m., well over one and a half hours before the end of the overtime shift.

119.    After 6:15 p.m., the building was not opened until 7:35 a.m. the following morning.

### Cooperating BPD Officers #1 and #2

120.    Cooperating BPD Officer #1 ("CO#1") and Cooperating BPD Officer #2 ("CO#2") have been interviewed by agents in this matter pursuant to a promise that information provided during the interview would not be used against them.

121.    The identities of CO#1 and CO#2 are known to myself and other agents.

122.    CO#1 and CO#2 have been granted judicially ordered immunity.

123.    CO#1 and CO#2 were employed by the BPD at the evidence warehouse from at least 2017 through at least 2019.

124.    During the time that CO#1 and CO#2 were employed at the warehouse, CO#1 and CO#2 were paid for working overtime shifts at the warehouse from 4:00 p.m. (1600) to 8:00 p.m. (2000).

125.   CO#1 and CO#2 have admitted to agents that they routinely left early from the warehouse while they were supposed to be working 4:00 p.m. to 8:00 p.m. overtime shifts.

126.   CO#1 and CO#2 knew that the 4:00 p.m. to 8:00 p.m. overtime shift, which followed their regular shift, was "hour for hour" overtime, and, that the overtime was earned in fifteen minutes increments.

127.   CO#1 and CO#2 knew that they were obligated, and had a duty, to honestly report the number of overtime hours that were actually worked on their overtime slips.

128.   CO#1 and CO#2 admitted that, despite leaving early on many occasions, from at least dates in 2017 up and through February 2019, CO#1 and CO#2 would falsely claim to have worked a full four hour shift in their overtime slips.

129.   CO#1 and CO#2 have informed agents that CO#1 and CO#2 knew that it was wrong to falsely claim to have worked a full four hour shift when they had left an hour, or more, before the end of the overtime shift.

130.   CO#1 and CO#2 have acknowledged that CO#1 and CO#2 personally observed, from at least 2017 through 2019, members of the ECU as they routinely left the warehouse an hour or more before 8:00 p.m. on nights that CO#1 and CO#2 were supposed to be working until 8:00 p.m.  CO#1 and CO#2 believed that these ECU officers were similarly supposed to be working until 8:00 p.m.

131.   On occasions, CO#1 and CO#2 personally observed as members of the ECU locked and alarmed the warehouse, and departed, an hour, or more, before 8:00 p.m. on nights when CO#1 and CO#2 believed that ECU officers were supposed to be working overtime until 8:00 p.m.

132.     CO#1 and CO#2 have informed agents that this conduct routinely occurred from at least 2017 through approximately February 2019, when Torigian, Twitchell, and O'Brien were placed on administrative leave.

**Cumulative Losses**

133.     Agents have obtained records from BPD detailing all of the overtime slips submitted by the members of the ECU along with records reflecting the amounts paid for those overtime shifts.  Agents have compiled the loss amounts for overtime slips for shifts worked by members of the ECU from 4:00 p.m. to 8:00 p.m. under overtime code "332"[15] since May of 2016 and have compared the hours that the officers claimed to have worked with the perimeter alarm records.

134.     Between May of 2016 and February of 2019, members of ECU have been paid over $900,000 for these 4:00 p.m. to 8:00 p.m. overtime shifts.

135.     As detailed below, there is probable cause to believe that, cumulatively, between May 2016 and February 2019, the members of the ECU were paid over $250,000 for overtime hours that they fraudulently and falsely claimed to have worked.

136.     During the period that Lt. Torigian oversaw the ECU, from May 2016 through February 2019, Lt. Torigian submitted overtime slips claiming to have worked approximately 466 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m. at the ECU Warehouse, totaling 1,864 overtime hours.  Lt. Torigian was paid over $151,000 for those overtime hours.

---

[15]As previously noted, some overtime slips reflected the overtime code, "320," for overtime shifts from 4:00 p.m. to 8:00 p.m.  For purposes of this Affidavit, no losses have been attributed to members of the ECU for overtime slips involving overtime codes other than "332."

137.   Based upon a comparison between the overtime slips submitted and the alarm records, agents have determined that Torigian (the user of TT1) was not present at the warehouse for over 526 of the hours he claimed in those overtime slips.

138.   There is probable cause to believe that Torigian was paid over $43,187 for overtime hours that he falsely claimed to have worked between May 2016 and February 2019.

139.   From December 2016 through February of 2019, Sgt. O'Brien submitted overtime slips claiming to have worked approximately 292 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1,168 overtime hours.  O'Brien was paid over $83,000 for those overtime hours.

140.   Based upon a comparison with the alarm records, agents have determined that Sgt. O'Brien was not present at the warehouse for approximately 363 of those hours.

141.   There is probable cause to believe that Sgt. O'Brien (the user of TT2) was paid over $25,965 for overtime hours that he falsely claimed to have worked between December 2016 and February 2019.

142.   From January 2017 through January of 2019, Sgt. Twitchell submitted overtime slips claiming to have worked approximately 279 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1,116 overtime hours.  Sgt. Twitchell was paid over $79,000 for those overtime hours.

143.   Based upon a comparison with the alarm records, agents have determined that Sgt. Twitchell was not present at the warehouse for approximately 358 of those hours.

144.   There is probable cause to believe that Sgt. Twitchell (the user of TT3) was paid over $25,678 for overtime hours that he falsely claimed to have worked between January 2017 and January 2019.

145.    From May of 2016 through February of 2019, Officer Doherty submitted overtime slips claiming to have worked approximately 398 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1,592 overtime hours.  Officer Doherty was paid over $94,050 for those overtime hours.

146.    Based upon a comparison with the alarm records, agents have determined that Doherty was not present at the warehouse for approximately 437 of those hours.

147.    There is probable cause to believe that Officer Doherty (the user of TT6) was paid over $26,032 for overtime hours that he falsely claimed to have worked between May 2016 and February 2019.

148.    From May of 2016 through February of 2019, Officer Lopez submitted overtime slips claiming to have worked approximately 360 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1440 overtime hours.  Officer Lopez was paid over $84,387 for those overtime hours.

149.    Based upon a comparison with the alarm records, agents have determined that Lopez was not present at the warehouse for approximately 359 of those hours.

150.    There is probable cause to believe that Officer Lopez (the user of TT9) was paid over $21,219 for overtime hours that she falsely claimed to have worked between May 2016 and February 2019.

151.    From July of 2016 through February of 2019, Officer Carnes submitted overtime slips claiming to have worked approximately 269 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1076 overtime hours.  Officer Carnes was paid over $68,931 for those overtime hours.

152.     Based upon a comparison with the alarm records, agents have determined that Carnes was not present at the warehouse for approximately 314 of those hours.

153.     There is probable cause to believe that Officer Carnes (the user of TT5) was paid over $20,185 for overtime hours that he falsely claimed to have worked between July 2016 and February 2019.

154.     From September of 2016 through February of 2019, Officer Murphy submitted overtime slips claiming to have worked approximately 247 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 988 overtime hours.  Officer Murphy was paid over $57,046 for those overtime hours.

155.     Based upon a comparison with the alarm records, agents have determined that Murphy was not present at the warehouse for approximately 274 of those hours.

156.     There is probable cause to believe that Officer Murphy was paid over $16,053 for overtime hours that he falsely claimed to have worked between September 2016 and February 2019.

157.     From May of 2016 through April of 2018, Officer Nelson submitted overtime slips claiming to have worked approximately 286 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 1,144 overtime hours.  Officer Nelson was paid over $72,856 for those overtime hours.

158.     Based upon a comparison with the alarm records, agents have determined that Nelson was not present at the warehouse for approximately 260 of those hours.

159.     There is probable cause to believe that Officer Nelson was paid over $16,662 for overtime hours that he falsely claimed to have worked between May 2016 and April 2018.

160.     From December of 2017 through February 2019, Officer Conway submitted overtime slips claiming to have worked approximately 187 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 748 overtime hours.  Officer Conway was paid over $48,081 for those overtime hours.

161.     Based upon a comparison with the alarm records, agents have determined that Conway was not present at the warehouse for approximately 256 of those hours.

162.     There is probable cause to believe that Officer Conway (the user of TT8) was paid over $16,479 for overtime hours that she falsely claimed to have worked between December 2017 and February 2019.

163.     From July of 2017 through December 2018, Officer Williams submitted overtime slips claiming to have worked approximately 124 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 496 overtime hours.  Officer Williams was paid over $32,640 for those overtime hours.

164.     Based upon a comparison with the alarm records, agents have determined that Williams was not present at the warehouse for approximately 169 of those hours.

165.     There is probable cause to believe that Officer Williams was paid over $11,181 for overtime hours that he falsely claimed to have worked between July 2017 and December 2018.

166.     From May 2017 through December 2018, Officer Agnew submitted overtime slips claiming to have worked approximately 123 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 492 overtime hours.  Officer Agnew was paid over $29,573 for those overtime hours.

167.     Based upon a comparison with the alarm records, agents have determined that Agnew was not present at the warehouse for approximately 161 of those hours.

168.     There is probable cause to believe that Officer Agnew (the user of TT4) was paid over $9,702 for overtime hours that he falsely claimed to have worked between May 2017 and December 2018.

169.     From May 2016 through May 2018, Officer Mason submitted overtime slips claiming to have worked approximately 109 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 436 overtime hours.  Officer Mason was paid over $27,117 for those overtime hours.

170.     Based upon a comparison with the alarm records, agents have determined that Mason was not present at the warehouse for approximately 115 of those hours.

171.     There is probable cause to believe that Officer Mason (the user of TT7) was paid over $7,208 for overtime hours that she falsely claimed to have worked between May 2016 and May 2018.

172.     From May 2016 through August 2017, Officer Joseph Nee submitted overtime slips claiming to have worked approximately 134 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 536 overtime hours.  Officer Joseph Nee was paid over $30,794 for those overtime hours.

173.     Based upon a comparison with the alarm records, agents have determined that Joseph Nee was not present at the warehouse for approximately 110 of those hours.

174.     There is probable cause to believe that Officer Joseph Nee was paid over $6,412 for overtime hours that he falsely claimed to have worked between May 2016 and August 2017.

42

175.    From May 2016 through February 2019, Officer Semedo submitted overtime slips claiming to have worked approximately 98 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 392 overtime hours.  Officer Semedo was paid over $23,400 for those overtime hours.

176.    Based upon a comparison with the alarm records, agents have determined that Semedo was not present at the warehouse for approximately 77 of those hours.

177.    There is probable cause to believe that Officer Semedo (the user of TT10) was paid over $4,594 for overtime hours that he falsely claimed to have worked between May 2016 and February 2019.

178.     From May 2016 through February 2018, Officer Thomas Nee submitted overtime slips claiming to have worked approximately 51 of the relevant overtime shifts from 4:00 p.m. to 8:00 p.m., totaling 204 overtime hours.  Officer Thomas Nee was paid over $11,706 for those overtime hours.

179.    Based upon a comparison with the alarm records, agents have determined that Thomas Nee was not present at the warehouse for approximately 62 of those hours.

180.    There is probable cause to believe that Officer Thomas Nee was paid over $3,590 for overtime hours that he falsely claimed to have worked between May 2016 and February 2018.

### Use of Interstate Wires

181.    Citizens Financial Group, Inc. aka Citizen's Bank, is a bank headquartered in Providence, Rhode Island, which operates in the Commonwealth of Massachusetts, among other states.  Citizens operates more than 1,000 branches and over 3,000 ATMs across 11 states under the Citizens Bank brand.

43

182.    Representatives of the City of Boston have informed me that Citizens Bank processes all BPD electronic funds transfers and direct deposits for BPD employees' salaries and have done so at all times relevant to this warrant.

183.    I have spoken to and communicated with representatives of Citizens concerning how Citizens receives and processes the payroll for BPD in the course of investigations relating to overtime fraud at the BPD.  Those representatives have informed me that, among other steps, in order to initiate the payment of BPD payroll, BPD electronically transfers to Citizens a file containing the information about BPD employees, their banks, and the amounts of money to be transferred to each employee for the work performed.  The City of Boston payroll department then transmits this electronic file across state lines to a Citizens facility located in Providence, Rhode Island.

184.    After Citizens processes this file in Rhode Island, Citizens deposits funds into the accounts of BPD employees in amounts designated by BPD.

**BPD Receives Federal Benefits**

185.    The United States Department of Justice ("DOJ") is an agency of the United States.

186.    Among other things, DOJ provides benefits and funding to law enforcement agencies, such as the BPD, through grants that promote the well-being of Boston residents.

187.    For example, through a federal grant, DOJ provided funding for the BPD to subcontract with Massachusetts General Hospital so that clinicians could respond with BPD officers to calls involving individuals with mental health issues.  The program further involved funding to allow a doctor from the University of Massachusetts to study the referrals and

outcomes from the program.  For this program advancing public safety and well-being, DOJ made payments of over $36,000 to BPD between July of 2017 and April of 2018.

188.     The United States Department of Transportation ("USDOT") is an agency of the United States that provides millions of dollars in funding on a yearly basis to law enforcement authorities that enforce traffic regulations on public roadways, including the BPD.

189.     For 2016, 2017, and 2018, BPD received annual benefits from the USDOT in excess of $10,000 which were funded by the USDOT pursuant to numerous federal grants.  This funding included, among other things, grants under the sustained traffic enforcement program ("STEP") which seeks to improve public well-being and public safety through enhanced traffic enforcement at locations where crashes occur most frequently.  Goals of this USDOT traffic enforcement funding include the reduction of motor vehicle fatalities, the reduction of impaired driving related crashes, the reduction of unrestrained vehicle passenger injuries, and, the reduction of pedestrian injuries from distracted driving.

## Conspiracy

190.     From at least May 2016 through February 2019, there is probable cause to believe there was an agreement, spoken or unspoken, that the members of the ECU would routinely work less than the required four hours for 4:00 p.m. to 8:00 p.m. "purge," "scan," "inventory," and/or "drug destruction" overtime shifts at the ECU Warehouse.

191.     From at least May 2016 through February 2019, there is probable cause to believe that members of the ECU knowingly and willfully entered into a spoken or unspoken agreement that, when they left early from these overtime shifts, the members of the ECU would submit false and fraudulent overtime slips claiming to have worked a full four hour shift so that they would be paid for overtime hours that they did not work.

192.    From at least May 2016 through February 2019, there is probable cause to believe that members of the ECU, including the Lieutenant and Sergeants supervising the unit, knowingly and willfully entered into a spoken or unspoken agreement whereby the Lieutenant and Sergeants supervising the unit would endorse false and fraudulent overtime slips submitted by the members of ECU, and that, as a result, the members of the ECU were paid over $250,000 for overtime hours that were not worked.

193.    From at least May 2016 through February 2019, there is probable cause to believe that the members of the ECU committed numerous overt acts in furtherance of the conspiracy, including, but not limited to: (1) the preparation of and submission to BPD of hundreds of false and fraudulent overtime slips; and (2) the endorsement by ECU supervisors of hundreds of false and fraudulent overtime slips.

### Connection to Phones

194.    In addition to the evidence of the subscriber information above, I am informed by representatives of BPD that BPD maintains records of the contact information of its officers, which often includes cellphone contact information.

195.    During the course of the investigation, agents asked members of the BPD Anti-Corruption Unit to provide agents with the contact information of the officers that was maintained in BPD personnel records and asked the current commander of the ECU for any cellphone numbers for members of the ECU that were in his possession.[16]

---

[16] To be clear, the current Captain in charge of ECU was asked to provide cellphone numbers for officers in the unit that he already possessed.  No information was solicited from the members of ECU at the direction of agents.

196.     During the relevant time period, Lt. Torigian was provided a BPD issued cellphone by the Department.  TT1 was identified by BPD as the cellphone number that had been assigned to Lt. Torigian by the BPD.  A preservation request was sent to Verizon on 10/28/2019.

197.     TT2 was identified by BPD as the contact number for Gerard O'Brien. Subpoenas to Verizon Wireless identified Gerard O'Brien as the subscriber.  A preservation request was sent to Verizon Wireless on 01/08/2020.

198.     TT3 was identified by BPD as the contact number for Robert Twitchell. Subpoenas to Verizon Wireless identified Kathleen Twitchell as the subscriber for TT3, Kathleen Twitchell is believed to be the spouse of Robert Twitchell based upon public record databases.  In addition, public record database searches have identified TT3 as belonging to Robert Twitchell.  A preservation request was sent to Verizon on 11/06/2019.

199.     TT4 was identified by BPD as the contact number for Darius Agnew.  Subpoenas to Verizon Wireless identified Darius Agnew as the subscriber for TT4.  A preservation request was sent to Verizon Wireless on 11/08/2019.

200.     TT5 was identified by BPD as the contact number for James Carnes in a BPD personnel database.  In addition, in December 2019, the current commander of the ECU was asked to provide a list of the cellphone numbers in his possession for the members of the unit. The Captain provided TT5 as the cellphone number for James Carnes.  Subpoenas to T-Mobile identified James Carnes as the subscriber for TT5.  A preservation request was sent to T-Mobile on 11/19/2019.

201.     TT6 was identified after BPD provided a contact number for Henry Doherty of (617) 825-2250.  Subpoenas to Comcast identified that number as a landline subscribed in the name of Henry Doherty at 44 Stock Street, Apt. 1, Dorchester, Massachusetts.  Comcast

identified TT6 as an "associated" phone number for that account.  A subpoena to AT&T identified TT6 as an AT&T Wireless phone subscribed by Henry Doherty at that same address. A preservation request was sent to AT&T on 11/27/2019.

202.    TT7 was identified by BPD as the contact number for Sybil Mason.  Subpoenas to Sprint identified Sybil White of 127 Wilmington Avenue, Dorchester, as the subscriber for TT5. A preservation request was sent to Sprint on 11/06/2019.

203.    TT8 was identified by BPD as the contact number for Kendra Conway. Subpoenas to AT&T identified Kendra Conway of 75 Maynard Street, Newton, MA as the subscriber for TT8.  In addition, in December 2019, the current commander of the ECU was asked to provide a list of the cellphone numbers he possessed for the members of the unit.  The Captain provided TT8 as the cellphone number for Kendra Conway.  A preservation request was sent to AT&T on 11/19/2019.

204.    TT9 was identified by BPD as the contact number for Diana Lopez.  A Subpoena to Verizon Wireless identified Diana Lopez as the subscriber for TT9.  A preservation request was sent to Verizon Wireless on 12/11/2019.

205.    TT10 was identified by BPD as the contact number for Kennedy Semedo.  A Subpoena to Verizon Wireless identified Kennedy Semedo as the subscriber for TT10.  A preservation request was sent to Verizon on 12/11/2019.

**Information Retained by Wireless Providers**

206.    In my training and experience, providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell

towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal

from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which

the telephone connected.  These towers are often a half-mile or more apart, even in urban areas,

and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless

device does not necessarily serve every call made to or from that device.  Accordingly, cell-site

data provides an approximate location of the cellular telephone but is typically less precise than

other types of location information, such as E-911 Phase II data or Global Positioning Device

("GPS") data.

207.    Based on my training and experience, I also know that wireless providers

typically collect and retain cell-site data pertaining to cellular phones to which they provide

service in their normal course of business in order to use this information for various business-

related purposes.

208.    Based on my training and experience, I know that Verizon also collects per-call

measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data

estimates the approximate distance of the cellular device from a cellular tower based on the

speed with which signals travel between the device and the tower.  This information can be used

to estimate an approximate location range that is more precise than typical cell-site data.

209.    Based upon information made available to federal law enforcement by the

wireless providers and information maintained by the DOJ for use by law enforcement; (1)

Verizon Wireless routinely maintains up to one year of information relating to the cell towers

accessed by a phone; (2) T-Mobile routinely maintains up to two years of information relating to

the cell towers accessed by a phone; (3) AT&T may routinely maintain information relating to

the cell towers accessed by a phone dating back to 2008; and (4) Sprint routinely maintains up to eighteen months of information relating to the cell towers accessed by a phone.

210.    Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the Target Telephones and may assist in the identification of co-conspirators.

211.    In my training and experience, individuals who own and use cellphones keep such cellphones on their persons.  Thus, it is reasonable to believe that evidence concerning the location of the cellphone belonging to an individual is relevant to the issue of where the user of that cellphone is located at a given time.

212.    Where, as here, there is probable cause to believe that individuals have falsely claimed to have been present at work performing overtime, evidence of the location of the Target Telephones during the period specified in the warrant is likely to be relevant to establishing whether those claims are true (or false).

## AUTHORIZATION REQUEST

213.     Based on the foregoing, I request that the Court issue the proposed search

warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

214.     I further request that, for TT1, TT2, TT3, TT4, TT9 and TT10, the Court direct

Verizon Wireless to disclose to the government any information described in Section I of

Attachment B-1, B-2, B-3, B-4, B-9, and B-10 that is within its possession, custody, or control.

Because the warrant will be served on Verizon Wireless, who will then compile the requested

records at a time convenient to it, reasonable cause exists to permit the execution of the

requested warrant at any time in the day or night.

215.     I further request that, for TT6 and TT8 the Court direct AT&T to disclose to the

government any information described in Section I of Attachment B-6 and B-8 that is within its

possession, custody, or control.  Because the warrant will be served on AT&T, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

216.     I further request that, for TT5 the Court direct T-Mobile to disclose to the

government any information described in Section I of Attachment B-5 that is within its

possession, custody, or control.  Because the warrant will be served on T-Mobile, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night

217.     I further request that, for TT7 the Court direct Sprint to disclose to the

government any information described in Section I of Attachment B-7 that is within its

possession, custody, or control.  Because the warrant will be served on Sprint, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night

218.    I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation, including by

giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior,

notify confederates, and flee from prosecution.

Respectfully submitted,

SA Shena Latta
Special Agent
Department of Justice,
Office of the Inspector General

Subscribed and sworn to before me on __January 13__, 2020

UNITED STATES MAGISTRATE JUDGE

52